865 F.2d 260
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Dora M. OUSLEY, Plaintiff-Appellant,
v.
SECRETARY OF HEALTH & HUMAN SERVICES, Defendant-Appellee.
 No. 88-1057.
 United States Court of Appeals, Sixth Circuit.
 Dec. 20, 1988.
 
 Before DAVID A. NELSON and BOGGS, Circuit Judges, and GEORGE CLIFTON EDWARDS, Jr., Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 The plaintiff in this social security disability case asserts that she suffers from an impairment listed in Sec. 1.05(c) of Appendix 1 to Subpart P of 20 C.F.R. Part 404--a claim which, if sustained, would automatically entitle her to disability benefits. She also claims to be disabled because of back pain. The plaintiff sued the Secretary in federal district court after her claim for disability benefits had been denied at the administrative level, and the court, acting upon the recommendation of a magistrate, entered summary judgment in favor of the Secretary. Finding that the Secretary's decision was supported by substantial evidence, we shall affirm the judgment of the district court.
 
 
 2
 * The plaintiff, Dora Ousley, was born on May 26, 1938. She has an eighth grade education, and her relevant job history consists of 27 years of work at the Chelsea Milling Company. She was employed there as a baler--work that involved heavy lifting and a great deal of walking and standing.
 
 
 3
 In the winter of 1982 plaintiff slipped on some ice in a parking lot and hurt her back. On September 25, 1983, she suffered a fall at work and hit her back on a skid. The following day she had still another fall. Pain in her back and left hip forced her to stop work about a week later. She returned to work in January of 1984 and continued working to March of that year, but she has not worked since then.
 
 
 4
 Plaintiff filed a claim for disability benefits on July 10, 1985, alleging disability due to back problems. Her initial claim was denied, as was a claim for reconsideration. She then appeared before Administrative Law Judge William D. Boham. The ALJ considered numerous medical reports and letters, and heard testimony from plaintiff and from a psychiatric medical advisor (Dr. Eugene Donovan), an orthopedic medical advisor (Dr. Robert Sobel), and a vocational expert (Dr. Peter Fotiu). The ALJ concluded that Ousley retained the capacity to perform light work and sedentary work, and that given her age, education, and work experience, application of the "grid" directed a finding of "not disabled." The Appeals Council denied review, and this lawsuit followed.
 
 
 5
 The district court referred the matter to U.S. Magistrate Charles Binder. In an eleven-page report and recommendation containing a thorough review of the record, Magistrate Binder determined that the ALJ's decision was supported by substantial evidence. District Judge John Feikens adopted the magistrate's report and granted the Secretary's motion for summary judgment.
 
 II
 
 6
 Plaintiff has been examined by several people since her back problems began, and the record in this case is an unusually full one. Unfortunately, however, much of the medical evidence is inconsistent and contradictory.
 
 
 7
 Plaintiff was first hospitalized in the W.A. Foote Memorial Hospital from March 5, 1984, through March 10, 1984. A myelogram performed at this time was negative. Flexion was within normal limits, for the most part. The hospital report notes plaintiff's claims of increased back pain, and also notes that she was suffering from emotional problems due to a strained relationship with her husband.
 
 
 8
 Plaintiff returned to the W.A. Foote Memorial Hospital in September of 1984 and had another myelogram. A defect was detected at L5-S1; the results were otherwise normal, essentially.
 
 
 9
 Plaintiff was hospitalized at the Pontiac Osteopathic Hospital from December 17 to December 21, 1985. Most laboratory tests conducted at this time, including an electrocardiogram, produced normal results. An electroencephelogram, however, was interpreted as a "possible potential epileptic-type EEG." (There is no other evidence in the record of epilepsy.) A CAT scan of the lumbar region "showed marked changes in L5-S1, more pronounced on the left." The discharge summary mentioned the consensus of several examining doctors that plaintiff's emotional problems tended to put a "strong psychological overlay" on her complaints of pain. The final diagnosis was chest pain secondary to possible angina, costal chondritis, chronic lumbar myositis, and endogenous depression.
 
 
 10
 Three of the medical reports in the record were prepared by Dr. William Mott, a board-certified orthopedic specialist, for claims representatives at an entity called Creative Risk Management. Dr. Mott first examined plaintiff on June 20, 1984. In listening to her subjective complaints of pain, Dr. Mott felt that "there are many inconsistencies in her responses that lead me to believe that there is exaggeration." His examination of her cervical spine demonstrated a full range of motion and "no objective evidence of local or myotomal findings of motor weakness, atrophy or muscle spasm." Her reflexes were normal, and there was "no evidence of radiculitis or radiculopathy." He noted that her dorsolumbar spine had a good range of motion, and she appeared to be comfortable in performing the exercises she was requested to do. She could bend forward while sitting and almost touch her toes, which Dr. Mott thought was inconsistent with "any sciatic involvement or any involvement of the nerves of the lumbar spine or lower extremity." Lumbar spine x-rays showed no evidence of destructive orthopedic pathology. EMG studies reviewed by Dr. Mott also showed no evidence of any moderate or severe impairment of the S1 nerve in either lower extremity.
 
 
 11
 A subsequent examination conducted by Dr. Mott on October 29, 1984, resulted in similar conclusions. At the end of this second report, Dr. Mott expressed the opinion that plaintiff was not physically disabled and could resume her former occupation. Finally, in reviewing the results of an EMG performed on November 27, 1984, Dr. Mott wrote that the EMG confirmed his findings of the absence of radiculitis, radiculopathy, neuropathy, or myopathy in the lumbar spine or lower extremities.
 
 
 12
 Dr. Leonard Sahn, a neurologist, evaluated plaintiff on January 22, 1985--again at the request of Creative Risk Management--and concluded that she had a back injury with left sciatica, which was largely healed. Dr. Sahn considered it doubtful that plaintiff could return to her former employment, but he said that she probably could return to some kind of gainful employment, with the restriction that she not engage in heavy lifting, prolonged standing, or repetitive bending.
 
 
 13
 Dr. Sahn wrote Creative Risk Management again on March 4, 1985, after receiving plaintiff's hospital records. The March letter reiterated that although the myelogram performed in September of 1984 indicated a nerve defect at the L5-S1 level, the symptoms had largely resolved themselves.
 
 
 14
 Dr. Tompkins, one of the treating physicians, examined plaintiff periodically from October 7, 1983, to August 19, 1985. At his last examination Dr. Tompkins concluded that plaintiff "appears to be functionally disabled." On prior visits, plaintiff had emphasized to Dr. Tompkins that she wanted to try to get well without surgery, even though she said other doctors had recommended surgery.
 
 
 15
 Dr. M.J. Fugle, an orthopedic surgeon who examined plaintiff on December 19, 1985, made a diagnosis of chronic lumbar myositis, acute coronary insufficiency, and endogenous depression. In April of 1986 plaintiff had a myelogram which Dr. Fugle interpreted as showing a herniated disc at L5-S1, with possible cervical narrowing as well.
 
 
 16
 Dr. Frederick Knocke examined plaintiff for the State of Michigan Disability Determination Service. He found muscle spasm, limited range of motion in the lumbar spine, and some slight misalignment of the L5-S1 vertebrae, along with some encroachment on the spinal canal. He reported that plaintiff's reflexes appeared to be essentially normal.
 
 
 17
 Dr. Sobel, who testified at the administrative hearing, opined initially that plaintiff met a listed impairment under Sec. 1.05(c). Dr. Sobel then seemed to reverse himself, however, stating that plaintiff's condition had basically resolved itself, and that while there was "mild" nerve root compression at the L5-S1 level, there was no "reflex deficit or measurable atrophy in the extremities." Reflex loss and muscle weakness are both required to meet the listing.
 
 
 18
 There are two psychiatric evaluations in the record. Neither is helpful to plaintiff. Dr. Doopyo Hong wrote that "[t]here isn't any doubt that the patient is trying to get some secondary gain with this pain problem.... In other words, the patient's mind is made up to get disability either way, physically or emotionally." Dr. Hong also wrote that "she was insightful about her surroundings, but she was not insightful about her tendency to exaggerate her symptoms." He recommended that she have more psychological testing to determine her personality profile. Dr. Christian Barrett wrote in the other psychiatric report that although plaintiff appeared able to perform most normal functions, "[t]he statements about her pain typically increase when she is posed with something that is difficult for her. There is considerable exaggeration of symptoms."
 
 
 19
 Dr. Donovan testified at the administrative hearing that based on the two psychiatric reports there was insufficient evidence to support a claim that plaintiff's depression and other psychological problems met listed impairment 12.04. Dr. Donovan did not comment on the relevance of the psychiatric reports to plaintiff's subjective complaints of pain.
 
 
 20
 Plaintiff herself testified that she suffered constant pain, that she could not sit still for more than five to ten minutes, and that she could not stand for more than two minutes. She said she used to attend a pain clinic, where she was taught exercises to reduce the pain, but she quit because the exercises made the pain worse. Plaintiff also testified that although Dr. Fugle had recommended that she have surgery on her back, she refused to allow the surgery because it would make her arthritis worse. She claimed that she was advised against the surgery by Dr. Tompkins and an unidentified doctor in Lansing, Michigan.
 
 
 21
 Vocational Expert Fotiu testified that if one were to believe plaintiff's subjective complaints of pain, there would be no jobs that she could be expected to perform. If one were to accept the testimony of Dr. Sobel as to her objective medical condition, however, Dr. Fotiu testified that there were many sedentary jobs in the Detroit area that plaintiff could perform.
 
 III
 
 22
 Under 20 C.F.R. Sec. 404.1520(d), if a claimant has a disability that meets or equals an impairment listed in Appendix 1, the claimant will be deemed disabled regardless of age, education, and work experience. Appendix 1, Sec. 1.05(c), lists the following as disabling impairments:
 
 
 23
 "C. Other vertebrogenic disorders (e.g., herniated nucleus pulposus, spinal stenosis) with the following persisting for at least 3 months despite prescribed therapy and expected to last 12 months with both 1 and 2:
 
 
 24
 1. Pain, muscle spasm, and significant limitation of motion in the spine; AND
 
 
 25
 2. Appropriate radicular distribution of significant motor loss with muscle weakness and sensory and reflex loss."
 
 
 26
 For disability to be established under Sec. 1.05(c), all of these requirements must be met. King v. Heckler, 742 F.2d 968, 973 (6th Cir.1984).
 
 
 27
 There is substantial evidence to support a finding that plaintiff failed to meet several of the requirements of Sec. 1.05(c). On both June 20, 1984, and October 29, 1984, Dr. Mott found that plaintiff had no restriction of movement or physical impairment in the upper or lower extremities. An electromyelogram performed on November 27, 1984, also shows no objective evidence of physical impairment. Dr. Sahn determined that, in spite of plaintiff's reluctance to perform bending tests, her range of motion was normal. There is evidence from which the ALJ could have determined that other elements of Sec. 1.05(c) were absent, such as muscle spasm and sensory and reflex loss.
 
 
 28
 Although the final report of treating physician Tompkins said plaintiff was functionally disabled, plaintiff told Dr. Tompkins at one point that her condition was improving. When Dr. Tompkins recommended surgery, plaintiff reportedly replied that "she does not want to have anything done unless she cannot get around at all and prefers to live the way she is at this time hoping that she will get better." This fact would tend to undercut a finding of disability, since a claimant, in order to be found disabled, must follow prescribed treatment if this treatment can restore the claimant's ability to work. 20 C.F.R. Sec. 404.1530(a)-(b).
 
 
 29
 At oral argument, counsel for plaintiff relied heavily on Exhibit 43, Dr. Fugle's report as objective medical evidence supporting a finding of disability under Sec. 1.05(c). The only finding in this report relevant to 1.05(c), however, is "chronic lumbar myositis." This is not the "vertebrogenic disorder" required by Sec. 1.05(c). We cannot, on this record, second-guess the ALJ's determination that plaintiff did not have a listed impairment.
 
 IV
 
 30
 Plaintiff also claims, separate and apart from the assertion that she has a listed impairment under Sec. 1.05(c), that she suffers from pain of such intensity that it constitutes a disability by itself. Duncan v. Secretary of HHS, 801 F.2d 847 (6th Cir.1986), describes the appropriate analysis:
 
 
 31
 "First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectivity established medical condition is of such severity that it can reasonably be expected to produce the alleged disabling pain."
 
 
 32
 801 F.2d at 853.
 
 
 33
 Assuming in this case that there is objective medical evidence of an underlying medical condition, it was within the province of the ALJ to find that the objective medical evidence fails to confirm the severity of the alleged pain, and that the pain is not disabling. It is surely relevant in this regard that both of the psychiatric reports, in addition to the discharge summary of the Pontiac Osteopathic Hospital, state that plaintiff has a psychological tendency to exaggerate her subjective complaints of pain.
 
 
 34
 AFFIRMED.